UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　　No. 4: 21 CR 425 RWS / DDN
　　　　　　　　　　　　　　　　　　)
JEFFREY REUTER,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　)

**ORDER AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Before the Court for consideration are the following pretrial motions of defendant Jeffrey Reuter:

(a)　　　for disclosure of the federal grand jury record (Doc. 75);

(b)　　　for disclosure of evidentiary material (Doc. 79);

(c)　　　to suppress physical evidence and statements (Doc. 44); and

(d)　　　to dismiss the indictment as violative of the Second Amendment (Doc. 96).

**BACKGROUND**

The indictment against defendant alleges that, beginning at a time unknown, continuing through December 10, 2019, and ending on or about December 11, 2019, within this judicial district, defendant

> knowing he was subject to a court order issued on December 13, 2017, by the 21st Judicial Circuit Court in case number 17SL-PN05581, and issued after a hearing of which he received actual notice, and at which he had an opportunity to participate, restraining him from harassing, stalking, or threatening an intimate partner, that by its terms explicitly prohibited the use, attempted use or threatened use of physical force against such intimate partner that would reasonably be expected to cause bodily injury, knowingly possessed one or more firearms, and the firearms previously traveled in

interstate or foreign commerce during or prior to being in defendant's possession.

In violation of Title 18, United States Code, Section 922(g)(8).

(Doc. 18.)

# I.

## *Disclosure of the federal grand jury record (Doc. 75)*

Defendant seeks disclosure of the federal grand jury record in this case.  Specifically referring to the application and affidavit of St. Louis County Police Detective Mark Berry for the issuance of a search warrant, defendant argues that the information in the affidavit was false and that this false information could have been submitted to the federal grand jury that returned his indictment.  The assertedly false information relates to the orders of protection that defendant allegedly had knowledge of when the charged criminal activity occurred. (Doc. 76.)

Under Federal Rule of Criminal Procedure 6, the Court may authorize disclosure of a grand-jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).  This means that a defendant must show that a "particularized need" exists for such materials before they are to be ordered released. *United States v. Broyles,* 37 F.3d 1314, 1318 (8th Cir. 1994); *United States v. Warren,* 16 F.3d 247, 253 (8th Cir. 1994).

Defendant Reuter has only speculated that the information provided to the grand jury is false.  The government argues that the subject information is not false and that defendant is speculating that Det. Berry was even a witness before the grand jury.  (Doc. 80.)  The undersigned concludes that defendant has failed to show a particularized need for disclosure of the grand jury record. *Warren*, 16 F.3d at 253.

The motion for production of the grand jury record is denied.

## II

### *Disclosure of evidentiary material (Doc. 79)*

Defendant seeks production of:

(a)    the grand jury record;

(b)    the bail report;

(c)    the file of this case;

(d)    the transcript of the state court order of protection hearing held December 12-13, 2017;

(e)    the transcript of defendant's motion to dissolve the state court temporary restraining order;

(f)    the state court temporary restraining order;

(g)    the 2013 orders of protection against him;

(h)    the 2013 appellate court case file on the order of protection;

(i)    the 2014 order that vacates the full order of protection;

(j)    the video of the assault on defendant by officers;

(k)    law enforcement officials' reports about a law enforcement assault on defendant and their related charging documents;

(l)    communications between law enforcement and defendant regarding the assault on defendant;

(m)    communications between defendant and law enforcement regarding defendant's request for an MRI and medical treatment; and

(n)    the affidavits signed by defendant and Jane Reuter, his mother, that were delivered to the Federal Public Defender's Office.

Pretrial discovery in a federal criminal case is limited.  Under Federal Rule of Criminal Procedure 16 a defendant is entitled to receive, upon request, the following information:  (1)  defendant's own oral and written statements, Fed. R. Crim. P. 16(a)(1)(A) and (B); (2)  his prior criminal record, see Fed. R. Crim. P. 16(a)(1)(D); (3) documents and tangible objects within the government's possession that "are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief

at the trial, or were obtained from or belong to the defendant," Fed. R. Crim. P. 16(a)(1)(E); (4) reports of examinations and tests that are material to the defense, Fed. R. Crim. P. 16(a)(1)(F); and (5) written summaries of expert testimony that the government intends to use during its case-in-chief at trial, Fed. R. Crim. P. 16(a)(1)(G).

The items defendant seeks fall into three groups: Group 1—materials originating in this federal case (items a, b, and c); Group II — materials originating in the underlying state court litigation (items d, e, f, g, h, and i); and Group III — materials relating to another incident, described as occurring at the Crawford County Jail where defendant was being detained (items j, k, l, m, and n). Defendant argues that this information is needed by him to prepare a defense to the indictment. (Doc. 79.)

Regarding the Group I items, other than item a,[1] defense counsel may obtain such from the Court's case management system and provide them to defendant.

Regarding the Group II items, in its response, the government states it has requested the relevant hearing transcripts from the St. Louis County Circuit Court (items d and e) but has not yet received them. It will advise defense counsel if and when it receives them.[2] Further, it does not have any of the other listed materials. (Doc. 104 at 2.)

Regarding the Group III items, the government stated these items relate to an alleged incident that occurred in the Crawford County Jail, that earlier defense counsel had notified the United States Marshals Service about the incident, and that following the incident, defendant was transferred to another detention facility. Defendant has not shown how these materials are related to this federal criminal case, and the government stated that it does not possess any of them. (Doc. 103 at 1.)[3]

---

[1] The Court has determined, above, in this Order and Recommendation that defendant is not entitled to disclosure of the grand jury record. It again denies the motion for production of the grand jury record.

[2] A similar statement was made by counsel for the government on the record of a hearing before the undersigned on April 27, 2022. (Doc. 84 Tran. at 4.)

[3] During proceedings on April 27, 2022, then defense counsel Eric Butts advised the Court that he had provided defendant with a copy of all the evidence his office had obtained from

Upon this record, the motion for production of the subject items [Doc. 79] is denied.

## III

### *Motion to suppress firearm seized from residence and statements (Doc. 44 at 10-15)*

Doc. 44, captioned  "Defendant's Motion to Dismiss Indictment and to Suppress Evidence and Statements," has three parts.  The first is a motion to dismiss the indictment as being legally insufficient; the second is a motion to suppress the firearm that was seized from defendant's residence on December 11, 2019; and the third is a motion to suppress statements defendant made on December 11, 2019, after his arrest and while en route to the St. Louis County Jail.[4]

On April 1, 2022, the undersigned recommended that the Doc. 44 motion to dismiss be denied.  (Doc. 66.)  On June 29, 2022, the District Judge sustained that recommendation and the motion to dismiss was denied.  (Doc. 88.)

The Court now takes up the motions to suppress the seizure of the firearm and the defendant's statements in Doc. 44.  On November 14, 2022, the Court held an evidentiary suppression hearing on these motions to suppress.  From the evidence adduced at that hearing, the undersigned makes the following findings of fact and conclusions of law.

---

the government.  Defendant's prior counsel advised Mr. Butts that they had similarly provided such discovery to defendant.  (Doc. 84 Trans. at 3.)

[4] Also during the April 27, 2022, proceedings, counsel for the government advised that defendant made statements on December 11, 2019, while he was in the residence and before he was taken into custody.  (Doc. 84 Trans. at 7.)   Further, counsel for the government stated items were seized from defendant's vehicle also on December 11, and journals were seized pursuant to federal search warrant executed a month later.  Counsel for the government did not know whether the government would use these items at trial. (*Id.* at 9.)  No information or specific motion regarding whether such material should be suppressed has been submitted to the Court.

## FACTS

1.      On December 7, 2019, St. Louis County Police Detective Mark Berry[5] was assigned to investigate a series of incidents involving an individual named Jeffrey Reuter and three judges of the St. Louis County Circuit Court.  On December 10, 2019, Det. Berry met with a St. Louis County prosecutor regarding the filing of a criminal complaint.  A complaint was filed against Reuter for tampering with a judicial officer; three counts were alleged, one for each of the respective judges.  Upon the complaint, an arrest warrant was issued by a St. Louis County Circuit Court Judge.

2.      During his investigation leading to the filing of the complaint on December 10, based upon documents created by Reuter in which he stated he was always armed, Det. Berry believed that Reuter might in fact be armed when the arrest operation occurred. Further, Reuter's residence was determined to be with his parents, David and Jane Reuter, at 9461 East Lakeview in Bonne Terre, St. Francois County, Missouri.

3.      On December 11, 2019, Dets. Berry, Randall White,[6] and Kevin Walsh, [7] and other officers went to the Reuter family's house at 9461 East Lakeview.  Because the police observed a black F-150 truck, that had been connected to Jeffrey Reuter, in the driveway there, Det. Berry believed defendant was then at that address.  In this operation, Det. Berry notified the St. Francois County authorities about his investigation.

4.      Det. Berry went to the front door of 9461 East Lakeview[8] and knocked. Someone on the inside asked who was there.  An officer replied it was the St. Louis County

---

[5] As of the date of the suppression hearing, Det. Berry had been with the St. Louis County Police Department for 20 years, of which he had been in the Intelligence Unit for 9 and a half years.

[6] As of the date of the suppression hearing, Det. White had been a police officer for nine years, during which he had been in the Intelligence Unit for three and a half years.

[7] As of the date of the suppression hearing, Det. Walsh had been with the St. Louis County Police Department for almost ten years, during which he had been in the Intelligence Unit for four years.

[8] More fully described below, 9461 East Lakeview is an A-frame lake house type residence.

Police and asked whether the speaker was Jeffrey Reuter. The speaker answered in the affirmative. When the police requested that he step outside the residence, he refused. Several times the police requested that Reuter step outside, because the police had an arrest warrant for him. Reuter refused to do so and stated that, if the police were to enter the residence to get him, he would be forced to defend himself.

5. At that time, to avoid an armed incident with Reuter, Det. Berry and the other officers took up defensive positions. They also asked the local authorities to respond. Det. Berry also had two members of the St. Louis County Crisis Intervention Unit present to negotiate a peaceful resolution of the confrontation.[9]

6. Thereafter, the police engaged in verbal negotiations with Reuter. During the negotiations, Reuter's mother Jane also spoke with him by phone. Reuter told the officers that he did not want to leave the residence but would exercise his Second Amendment rights. Based on these statements, Det. Berry was concerned that Reuther might not ever come out voluntarily.

7. During this standoff, which lasted approximately an hour, Det. Machens, who was stationed behind the structure, saw through a closed window a silhouette of a person walking back and forth inside the residence, whom he believed could have been a second subject. Until they later entered the residence, the police were unable to determine with certainty whether Reuter was alone or someone else was with him.

8. At this point, Det. Berry left the scene and traveled to Farmington, Missouri, with a St. Francois County police sergeant to obtain a state court search warrant for 9461 East Lakeview.

9. While Det. Berry was away seeking a search warrant, Jeffrey Reuter opened the front door and came out of the residence voluntarily. He was immediately searched and handcuffed. As per police procedure, in such circumstances, police removed Reuter from the scene quickly. Within a few minutes, Reuter was secured in a seat in the St. Louis County police minivan. As soon as Reuter was secured, with Dets. Machens and Meadows

---

[9] Det. Berry had reason to believe Jeffrey Reuter might have mental health issues.

seated in the back seat,  Det. White proceeded to convey Reuters to the St. Louis County Justice Center.

10.    En route to the St. Louis County Justice Center, the officers and Reuter engaged in casual conversation about such things as football, dental practice, and marriage. There was no attempt by the officers to interrogate Reuter for the investigation, because they were not otherwise involved in the investigation.  The conversation was pleasant.

11.    During the trip to the Justice Center, Det. White expressed his relief that the confrontation peacefully, by thanking Reuter for coming out of the residence peacefully. Reuter responded by stating that Det. Kester's demeanor while negotiating with him and the fact that Reuter's mother was able to speak with Reuter all helped him decide to leave the residence voluntarily.  Reuter then asked whether the police would have eventually entered to get him.  Det. White answered Yes, if the negotiations failed.  There was no follow-up questioning by the police.  The conversation was not recorded.

12.    Reuter's parents arrived at the 9461 East Lakeview residence.  Det. Walsh and Officer Kester spoke with them.  They told the parents that their son had been taken into custody and that he was fine.  David Reuter, Jeffrey's father, was visibly upset but very cooperative with the officers.  He confirmed to them that he owned the house.  When asked whether he would consent to a search of the residence, David took out his key to the residence intending to open the front door for the police.  It was unnecessary for the police to use the key, because it was unlocked when Jeffrey Reuter voluntarily came outside.  At this time, David Reuter signed a written consent for the police to enter and search 9461.

13.    In the meantime, before the St. Francois County search warrant process was completed, Det. Berry was notified that Reuter had surrendered himself and that Reuter's father had given his written consent for the police to search 9461.  For these reasons, Det. Berry returned to 9461 without completing the process of obtaining a search warrant.

14.    Shortly after David Reuter signed the written consent for the police search, the police entered and searched 9461 and seized a firearm from the bed in the upstairs area.

15.    The residence was an A-frame structure with access from the street to a front door.  Inside the front door, besides the first floor is a second floor loft then being used as

makeshift bedroom.  The bedroom had no walls to separate it from the rest of the structure's interior.  The loft was accessed by a staircase from the first floor which contained a living room and a kitchen.  The residence contained a couch and lots of strewn clothing.  Only Jeffrey Reuther resided in 9461.

16.    On the second floor loft bed, Officer Kester located and seized a firearm and a disconnected ammunition magazine.

17.    Prior to the police entry, the officers intended to perform a protective sweep of the residence, even if they had not received a written consent to search from David Reuter.  The officers intended this as a protective measure to protect them from potential danger from another person.  No other person was found inside the structure.

18.    A few days later, Det. Berry was told by Reuter's parents that they, not Reuter, owned 9461 but that Reuter had been staying there for two and a half years without paying rent.  Reuter's parents themselves resided at a location in St. Louis County.  Reuter's ex-wife also told the police that Reuter stayed at 9461.

19.    Jeffrey Reuter never gave his consent for the police to search 9461 East Lakeview.

## DISCUSSION

### *The firearm*

Defendant moves to suppress the firearm that was seized from 9461 East Lakeview, because the seizure was without a warrant and his consent to the search, in spite of his father's consent.  (Doc. 44.)

In response, the government argues that defendant's father had actual common authority to consent to the search or at the least apparent authority to consent.  Even if defendant's father did not have sufficient authority to consent, the government argues the search and seizure were valid under the inevitable discovery doctrine.  (Doc. 46.)

These arguments invoke the provisions of the Fourth Amendment, which provides as follows:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated, and

- 9 -

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

U. S. CONST. amend IV.

It is not disputed that the warrantless seizure of the firearm from 9461 was a seizure that is covered by the Fourth Amendment. *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61 (1992) (a Fourth Amendment seizure occurs when there is a "meaningful interference with an individual's possessory interests that property.")   Absent an appropriate exception, without a judicial warrant, searches and seizures that are covered by the Fourth Amendment are *per se* constitutionally unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Riley v. California*, 134 S. Ct. 2473, 2482 (2014).   The government first argues the search of the 9461 was lawful under the Fourth Amendment because defendant's father voluntarily consented to the search.

The record clearly establishes that the police had probable cause to search for the firearm.  Defendant was reasonably believed, from his own history of statements prior to the December 11 standoff, to be constantly armed.  And after the police arrived at 9461 defendant clearly expressed his intention to preserve his rights under the Second Amendment.

The Supreme Court has long interpreted the Fourth Amendment's reasonableness standard to legitimize a warrantless search where law enforcement has the consent of someone who has "common authority over premises" even where that authority is shared with an absent, nonconsenting subject of the search. *United States v. Matlock*, 415 U.S. 164, 170-71 (1974).  Prior to searching a residence without a warrant, the "police must reasonably believe at the time of the search that the person consenting to the search has the authority to do so." *United States v. Oates*, 173 F.3d 651, 656 (8th Cir. 1999) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)).   There is no factual dispute that defendant's father voluntarily consented in writing to the police entering 9461 to search it and that his father demonstrated his authority to consent by producing his key to the residence and confirming that he owned the house.

Besides the authorized consent exception to the warrant requirement of the Fourth Amendment, the officers' search and seizure of the firearm are legitimized by two other exceptions to the warrant requirement:  the inevitability of the discovery and seizure of the firearm being authorized by a warrant and the exigent circumstances doctrine.

The inevitable discovery doctrine applies in this case.  If evidence "ultimately or inevitably would have been discovered by lawful means," the evidence ought not be suppressed.  *Nix v. Williams*, 467 U.S. 431, 444 (1984).  Det. Berry had probable cause for the search of 9461 and had engaged in applying for a search warrant when he learned of David Reuter's consent.  Even applying a required coexistence of an alternative line of investigation, *see United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997), it was inevitable that the St. Francois County Circuit Court would likely have found probable cause and issued its search warrant and the firearm would have been found and seized.

Further, the officers were authorized by the exigent circumstances of the presence of a firearm in the residence.  *Warden v. Hayden,* 387 U.S. 294, 298-99 (1967); *United States v. Sanders*, 4 F.4th 672, 678 (8th Cir. 2021).  Law enforcement lawfully entered 9461 and seized the firearm reasonably believed to be there.  To leave a firearm in the residence when its known occupant was in custody could unreasonably have endangered the officers on the scene and the public after law enforcement left.

The motion to suppress the firearm as evidence should be denied.

### *The defendant's statements*

Defendant argues that the statements he made in the police vehicle en route to the St. Louis County Justice Center on December 11, 2019, should be suppressed because he was not advised of his rights to remain silent and to counsel as required by *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Doc. 44.)   The government argues in response that the *Miranda* warnings were not required because in the relevant circumstances the officers were not engaging in custodial interrogation, but rather informal conversation with defendant.  (Doc. 46.)

Regarding when the *Miranda* warnings ought to be given, the Supreme Court has stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

Clearly, what happened in the police vehicle did not amount to police interrogation of defendant Reuter under *Innis*.  While *en route* defendant and the officers engaged in casual conversation about informal topics.  Nothing was disclosed that could be understood as reasonably likely to evoke from defendant any statement that might advance the government's case against him.

When the conversation entered that day's activities, Det. White made a statement that was not a question or reasonably intended to evoke an incriminating response.  After an hour's armed standoff that defendant ended peaceably, Det. White reasonably expressed to defendant his natural appreciation for him coming out peaceably.  There was no question implied in the statement.  Defendant did respond, however, but with his own natural expression of appreciation for the manner in which the police conducted the negotiation. Then defendant himself asked the first question, about what the police had intended to do if he had not come out.  That question was answered.  There was no follow-up questioning by the police.

– 12 –

Defendant was not subjected to police interrogation that called for the administration of the *Miranda* warnings. For this reason, the motion to suppress his statements should be denied.

## IV

### *Motion to dismiss the indictment as violative of the Second Amendment (Doc. 96)*

Defendant Reuter seek the dismissal of the indictment because it violates the Second Amendment. (Doc. 96.) The government opposes the motion. (Doc. 102.) For the reasons set forth below, the undersigned recommends that defendant's motion to dismiss be denied.

### BACKGROUND

On November 2, 2017, defendant's ex-wife petitioned the Circuit Court of St. Louis County for an ex parte order of protection against defendant; he was served with an ex parte order on November 6, 2017. After a hearing on December 13, 2017, the Circuit Court issued a full order of protection against defendant. The order was "effective until Dec. 11, 2019." There is no record of service of the full order upon defendant.

Defendant asserts that on December 7, 2019, he went to the residences of three judges that he believed had subjected him to unfair and illegal treatment, and he left letters requesting injunctive relief and monetary damages. Defendant did not encounter any of the judges. Police were notified, and they obtained an arrest warrant. On December 11, 2019, after a non-violent standoff, police arrested defendant at his residence for Tampering with Judicial Officers.

The federal indictment alleges that defendant, beginning at a time unknown, continuing through December 10, 2019, and ending on or about December 11, 2019, within this judicial district,

> knowing he was subject to a court order issued on December 13, 2017, by the 21st Judicial Circuit Court in case number 17SL-PN05581, and issued after a hearing of which he received actual notice, and at which he had an opportunity to participate, restraining him from harassing, stalking, or

threatening an intimate partner, that by its terms explicitly prohibited the use, attempted use or threatened use of physical force against such intimate partner that would reasonably be expected to cause bodily injury, knowingly possessed one or more firearms, and the firearms previously traveled in interstate or foreign commerce during or prior to being in defendant's possession.

In violation of Title 18, United States Code, Section 922(g)(8).

(Doc. 18.)  Title 18, U.S.C. § 922(g)(8) provides:

It shall be unlawful for any person . . .  who is subject to a court order that (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and . . .

(C)(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . [to possess or] receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Defendant moves to dismiss the indictment, arguing that the Supreme Court's holding in *New York State Rifle & Pistol Assoc., Inc. v. Bruen* renders § 922(g)(8) unconstitutional, both facially and as applied to him. 142 S.Ct. 2111, 2127 (2022); (Doc. 96.)  He argues that the statute operates as a disarmament law addressing a persistent social problem and is not supported by the historical tradition.  (Doc. 97 at 3.)  He contends that the Second Amendment protects his alleged conduct because § 922(g)(8)  always prohibits a person from possessing a firearm and that there is little to no historical evidence for such disarmament based on a domestic violence protective order.  (*Id*. at 4-5.)  He also argues that the statute is unconstitutional as applied to him because there are no facts that point to a history of violence.  (*Id*. at 6.)

In response, the government argues that the conduct prohibited by § 922(g)(8) does not fall under the Second Amendment because the Amendment protects only the rights of

law-abiding, responsible citizens to possess firearms for self-defense. (Doc. 102 at 3.) It notes that § 922(g)(8) applies only to those who have been judicially determined, "after a hearing of which such person received actual notice" and at which had an opportunity to participate, to be a "credible threat" to the physical safety of another person. (*Id*. at 6.) It further contends that the statute is consistent with the common-law practice of disarming dangerous persons, and it cites statements during ratification of the Bill of Rights supporting the right to bear arms only for peaceable citizens. (*Id*. at 9-10.) It also argues that § 922(g)(8) is analogous to historical surety laws, which imposed protections for the peace of the community and sometimes included disarmament of the offender. (*Id*. at 12-13.) Like the prohibition at issue in § 922(g)(8), surety laws lasted for a specified time. (*Id*. at 14.) Lastly, it asserts that the recency of § 922(g)(8) and protective order statutes does not render them unconstitutional because they are analogous to other historical practices. (*Id*. at 15.)

In reply, defendant argues that there is no doubt that the plain text of the Second Amendment protects his conduct, as the statute prohibits any possession of a firearm. (Doc. 114 at 2.) He contends that "the people" to whom the Second Amendment refers includes all members of the American political community, not only to law-abiding, responsible citizens. (*Id*. at 3.) He argues that there is not a historical tradition from the time of the Republic's founding of disarming dangerous people; that colonial debates and proposals do not support the restrictions in § 922(g)(8); and that surety laws are not sufficiently analogous to the statute. (*Id*. at 6, 8, 10.) Lastly, he argues that § 922(g)(8) is unconstitutional as applied to him because he was a citizen with ordinary self-defense needs, protected by the Second Amendment, on the day his home was searched. (*Id*. at 14.)

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the United States Supreme Court held that the Second Amendment "conferred an individual right to keep and bear arms." 554 U.S.

570, 595 (2008). The Court further stated that the right is not unlimited and that its opinion should not be taken to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27. Two years later, the Supreme Court held in *McDonald v. City of Chicago* that the individual right to keep and bear arms is "fundamental" and applies to the federal government and to the states through the Due Process Clause of the Fourteenth Amendment. 561 U.S. 742, 791 (2010).

The Supreme Court clarified the standard for Second Amendment claims in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022). *Bruen* concerned a challenge to New York gun licensing law that required applicants to show "proper cause" in order to obtain a license to carry a firearm in public. *Id*. at 2123. While not defined by statute, courts in New York had held "that an applicant shows proper cause only if he can 'demonstrate a special need for self-protection distinguishable from that of the general community.'" *Id*. (citing *In re Klenosky*, 428 N.Y.S.2d 256, 257 (App. Div. 1980)). The Court struck down the licensing law, concluding that the nation's history and tradition did not justify the proper-cause requirement. *Id*. at 2156.

The *Bruen* Court rejected the two-step approach, adopted by some circuits following *Heller* and *McDonald*, that combined historical analysis and means-end scrutiny. *Id*. at 2125. It held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. To justify regulation of presumptively protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. The Court must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. at 2131-32. The government bears the burden of proffering historical precedent to sustain the challenged regulation. *Id*. at 2150. "[E]vidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" *Id*. at 2136 (quoting *District of Columbia v. Heller*,

554 U.S. 570, 605 (2008)).  "[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [the Court's] interpretation of an ambiguous constitutional provision."  *Id*. at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014)).

### Facial challenge

Defendant Reuter first brings a facial challenge to § 922(g)(8).  To succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which [§ 922(g)(8)] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Eighth Circuit has yet to consider the impact of *Bruen* on § 922(g)(8). However, in its 2011 decision in *United States v. Bena*, the Eighth Circuit reviewed the historical basis for § 922(g)(8) and concluded that it was not precluded by the Second Amendment.  664 F.3d 1180, 1184 (8th Cir. 2011).  Analyzing the historical evidence from the period of the nation's founding, the court noted that scholarship "suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible."  *Id*. at 1183.  It cited commentary from William Blackstone and proposals from Samuel Adams and Pennsylvania delegates that restricted the right to bear arms to peaceable citizens.  *Id*.  Based on the historical record, the court held that, "[i]nsofar as § 922(g)(8) prohibits possession of firearms by those who are found to represent 'a credible threat to the physical safety of [an] intimate partner or child,' . . . it is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens."  *Id*. at 1184.  While the court noted that the statute promotes the government's interest in public safety, its holding relied on analysis of the historical record and not on a means-end test.  *See id*.  The Eighth Circuit further reasoned that "the Supreme Court viewed the regulatory measures listed in *Heller* as presumptively lawful because they do not infringe on the Second Amendment right."  *Id*. at 1183.

*Bena* remains controlling unless it was "repudiated or undermined by later authority, such as a statute, an intervening Supreme Court decision, or en banc decision."  *Dean v. Searcey*, 893 F.3d 504, 511 (8th Cir. 2018) (quoting Bryan A. Garner et al., The Law of

Judicial Precedent 38 (West 2016)).  Since the Supreme Court decided *Bruen*, at least two district court decisions within the Eighth Circuit have concluded that *Bena* remains controlling precedent.  The first, *United States v. Hammond*, held that *Bruen* did not undermine *Bena*; *Bena*, in fact, "essentially foreshadowed *Bruen* by focusing on text and history and declining to engage in means-end scrutiny."  No. 4:22-cr-00177-SHL-HCA, 2023 WL 2319321 at *3 (S.D. Iowa Feb. 15, 2023).  After reviewing the two components of the *Bruen* test, the court determined that "*Bena* is consistent enough with *Bruen* to conclude that it remains good law, regardless of whether its analysis is better understood as applying to the first or second stage of the *Bruen* test."  *Id*. at *6.  The second, a report and recommendation in *United States v. Robinson*, from this Court, noted that *Bena*'s analysis "hinges largely if not entirely on the historical, founding era understanding of the Second Amendment, as dictated by *Heller*."  No. 4:22 CR 165 RLW (JMB),  Doc. 46, Report and Recommendation of United States Magistrate Judge, at 14 (March 28, 2023).  It concluded that "[w]hile the language used in *Bena* may differ from that used in *Bruen*, it is not so far afield as to place the validity of *Bena* into such serious doubt that our Court is now free to consider the issue anew."  *Id*.

The undersigned similarly concludes that the approach adopted by the Eighth Circuit in *Bena* is similar enough to the standard set out in *Bruen* to remain controlling. *Bruen* acknowledged that the "historical inquiry that courts must conduct will often involve reasoning by analogy" and "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " *Bruen*, 142 S. Ct. at 2132.  *Bena* engaged in the kind of reasoning by analogy mandated by *Bruen*.  While *Bena* noted the public policy rationale for firearm regulation, its holding relied squarely on the regulation's consistency with common-law tradition.  664 F.3d at 1184.

Defendant Reuter cites decisions from outside the Eighth Circuit, including *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), and *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).  In *Rahimi*, the Fifth Circuit overruled its prior decisions upholding § 922(g)(8), acknowledging that those decisions utilized the kind of

means-end scrutiny rejected by the Supreme Court in *Bruen*.  61 F.4th at 450 (citing *United States v. Emerson*, 270 F.3d 203, 263 (5th Cir. 2001), and *United States v. McGinnis*, 956 F.3d 747, 753 (5th Cir. 2020)).  As discussed above, *Bena* remains controlling law in the Eighth Circuit, so the Court declines to analyze the authority cited by defendant Reuter.

Because *Bena* remains controlling after *Bruen*, the undersigned recommends that the Court deny defendant Reuter's motion to dismiss based on a facial challenge to § 922(g)(8).  *Compare United States v. Sitladeen*, ___ F.4th ___, 2023 WL 2765015 (8th Cir. April 4, 2023), which similarly held that post-*Heller* and *McDonald* Eighth Circuit authority remained controlling authority post-*Bruen* and found 18 U.S.C. § 922(g)(5)(A) not to be violative of the Second Amendment.

### As-applied challenge

To succeed on an as-applied challenge to the constitutionality of a statute under the Second Amendment, defendant must demonstrate not that a law is unconstitutional as written, but "that its application to [him] under particular circumstances deprived [him] of a constitutional right."  *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019).  In the case of Second Amendment challenges, the Eighth Circuit requires defendant to "present[ ] facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections."  *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (quoting *United States v. Barton*, 633 Fed.3d 168, 174 (3rd Cir. 2011)). Those facts should demonstrate that he is "no more dangerous than a typical law-abiding citizen" for the challenge to succeed. *United States v. Hughley*, 691 Fed. App'x. 278, 279 (8th Cir. 2017) (quoting *United States v. Brown*, 436 Fed. App'x 725, 726 (8th Cir. 2011)).

Defendant Reuter's as-applied challenge relies, in part, on his contention that the search that uncovered the firearm was conducted without a warrant and is arguably suppressible.  (Doc. 97 at 6.)  He also contends that, insofar as § 922(g)(8) is facially unconstitutional, the Court should conclude that he has succeeded in challenging the statute as applied.  (Doc. 114 at 14.)  He otherwise argues that there are no facts in this case that

point to past violence.  (Doc. 97 at 6.)  The government contends that defendant Reuter's as-applied challenge is premature because it would require the Court to resolve factual issues related to his alleged conduct.  (Doc. 102 at 2.)

To the extent that defendant Reuter's as-applied challenge relies on the facial unconstitutionality of § 922(g)(8), the undersigned concludes that the challenge fails on the basis of the analysis above.  Further, in this Order and Recommendation the undersigned recommends that his motion to suppress the firearm seized on December 11, 2019, be denied.

The undersigned concludes that the Court lacks sufficient evidence at this time to decide whether defendant is "more dangerous than a typical law-abiding citizen." *Hughley*, 691 Fed. App'x at 279.  While defendant Reuter produced a copy of the protective order in support of a previously ruled-on motion to dismiss the indictment (Doc. 44-1), factual questions remain regarding his conduct while under the order of protection, e.g., the allegedly threatening communications with three St. Louis County judges.  Additionally, defendant Reuter has previously maintained that there is no record that the protective order was served upon him.  (Doc. 44 at 3.)  The undersigned recommends that the Court deny without prejudice defendant Reuter's as-applied challenge, subject to reconsideration after trial.

## CONCLUSION

For these reasons,

**IT IS HEREBY ORDERED** that the motion of defendant Jeffrey Reuter for disclosure of the federal grand jury record **[Doc. 75] is denied;**

**IT IS FURTHER ORDERED** that the motion of defendant for disclosure of evidentiary material **[Doc. 79] is denied**;

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress the firearm seized from his residence and the statements he made on December 11, 2021 **[Doc. 44] be denied**.

**IT IS FURTHER RECOMMENDED** that the motion to defendant to dismiss the indictment as violative of the Second Amendment **(Doc. 96) be denied without prejudice**.

**The parties are advised they have until May 16, 2023, to file documentary objections to this Order and Recommendation.  Failure to file a timely documentary objection may waive the right to appeal issues of fact.**

**_____/s/ David D. Noce_____**
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 24, 2023.